COMMONWEALTH of Kentucky, CABINET FOR HEALTH AND FAMILY SERVICES; and J.L.H., a Child, Appellants,

v.

T.N.H., Mother, and P.N.Y., Father, Appellees.

No. 2008–SC–000318–DGE.

Supreme Court of Kentucky.

Jan. 21, 2010.

Erika L. Saylor, Office of Legal Services, Cabinet for Health and Family

Services, Louisville, KY, Counsel for Appellant Cabinet for Health and Family Services.

Teresa M. Kinberger, Kinberger Law Office, PLLC, Louisville, KY, Counsel for Appellant J.L.H.

John Harold Helmers, Jr., Troy DeMuth, Helmers, DeMuth, & Walton PLC, Louisville, KY, Counsel for Appellee T.N.H.

John T. Fowler, III, Louisville, KY, Counsel for Appellee P.N.Y.

Opinion of the Court by Justice SCHRODER.

We granted discretionary review in this case wherein the Court of Appeals reversed the decision of the Jefferson Family Court terminating the parental rights of the mother, who was a minor and committed to the Cabinet, because the Cabinet did not present specific evidence of the likelihood that the mother not would develop the necessary skills to successfully parent the child when she reaches majority age. We adjudge that proof that the minor parent will be unable to effectively parent the child when the parent reaches the age of majority is not required under KRS 625.090(2)(e) or (g). Because the Cabinet presented sufficient evidence that it was unlikely that the mother's conduct and ability to effectively parent the child would improve in the immediately foreseeable future, we reverse the decision of the Court of Appeals and reinstate the judgment of the Jefferson Family Court terminating the mother's parental rights.

T.N.H. is the natural mother of a son, J.L.H., born April 13, 2003, when T.N.H. was fourteen years of age. Shortly after the birth, on July 30, 2003, the Cabinet for Health and Family Services (the "Cabinet") filed a petition for dependency and neglect, alleging that T.N.H. was neglect-ing J.L.H. At that time, both mother and son were placed in the custody of a maternal aunt, where they remained until August 28, 2003, when both mother and son were voluntarily committed to the Cabinet's custody. At that point, both mother and son were placed in a foster home, where J.L.H. remained at the time of the termination hearing.

During T.N.H.'s placement at the foster home, she was disruptive and did not participate in the care of J.L.H. She ultimately ran away from the home and was dismissed from school. She was thereafter placed in the Mary Kendall Home in Owensboro where she was provided counseling services for her negative behavior. During her stay at the Mary Kendall Home, although her aggressive behavior and grades improved, she went AWOL three times. Nevertheless, she graduated from the home's treatment program on February 11, 2005, and was then placed in the Home of the Innocents Pregnant Parent Teen Facility ("HOI").

While at HOI, T.N.H. was offered parenting classes and counseling and was admitted into a program which permitted her to attend high school while caring for her son. The program at HOI allowed J.L.H. to go to school with T.N.H. each morning where he would attend daycare while T.N.H. was in class. At night, J.L.H. would stay with his foster parents, and on weekends, mother and son were allowed overnight visits at the maternal aunt's home.

During her time at HOI, despite some sporadic improvement in some areas, T.N.H. failed to participate in the services offered her because she insisted she did not need parenting classes, repeatedly violated curfew, sought negative peer influences, and ran away several times. As to her relationship with J.L.H., T.N.H.'s social worker, James Crawford, testified that

there was no apparent bonding between the two and the child continued to call T.N.H. by her first name instead of "mommy." Further, T.N.H. continued to require extensive direction in her parenting of J.L.H. and repeatedly stayed out with friends instead of tending to the needs of J.L.H. T.N.H. last ran away from HOI on April 9, 2005, after only two months in the program.

The evidence established that during the last time T.N.H. was AWOL from HOI, she had no contact with J.L.H., who remained in the same foster home, and did not make any inquiry about his well-being for 107 days. From April 9, 2005 until July 27, 2005, T.N.H. was with her boyfriend and only returned to seek medical assistance from the Cabinet after her boyfriend had physically abused her.

Upon T.N.H.'s return, she was temporarily placed in a foster home because she had lost her placement at HOI due to her extended absence. On August 4, 2005, T.N.H. was placed at Kentucky Baptist Homes for Children ("KBHC") in Glendale, Kentucky where, unfortunately, she continued her previous pattern of running away, fighting with peers, and failing to cooperate with the treatment program. KBHC provided T.N.H. with counseling, independent living skills training, parenting classes, and supervised visits with J.L.H. On February 27, 2006, T.N.H. graduated from the KBHC program. However, at the time of her discharge, T.N.H. had not yet obtained her high school diploma or GED and, according to the testimony of Crawford, had not demonstrated any substantial improvement in her parenting abilities or personal judgment.

After her discharge from KBHC, T.N.H. was placed in the Boys Haven Pre–Independent Living Program in Louisville. As of the date of the termination hearing, T.N.H. remained in that placement and resided in a dormitory there with full-time supervisory staff. At the time of the hearing, T.N.H. had a part-time job and was about to complete the 11th grade.

As for J.L.H., Crawford testified that he was doing very well in his placement with his foster family. According to Crawford, J.L.H. was happy and attached to his foster parents, calling them "mom" and "dad." Crawford testified that the foster parents were willing to adopt J.L.H.

The Cabinet filed its petition for involuntary termination of T.N.H.'s parental rights on November 28, 2005.[1] The hearing was held on March 7, 2006. Crawford was the only witness for the Cabinet. T.N.H. and her maternal aunt testified for T.N.H. Thereafter on March 23, 2006, the family court entered its order granting the petition. The family court specifically found: that J.L.H. was an abused or neglected child as defined in KRS 600.020(1) (KRS 625.090(1)(a)2.); that it was in the best interests of J.L.H. that parental rights be terminated (KRS 625.090(1)(b)); that T.N.H. for a period of not less than six months had continuously or repeatedly failed or refused to provide or had been incapable of providing essential parental care for J.L.H. and there was no reasonable expectation of improvement in parental care and protection (KRS 625.090(2)(e)); that T.N.H., for reasons other than poverty alone, had continuously or repeatedly failed to provide or was incapable of providing essential food, clothing, shelter, medical care or education reasonably necessary and available for J.L.H.'s well-being and there was no reasonable expectation of significant improvement in T.N.H.'s conduct in the immedi-

---

1. The petition was also filed against J.L.H.'s father, P.N.Y., who thereafter voluntarily terminated his parental rights and did not enter an appearance in the Court of Appeals.

ately foreseeable future (KRS 625.090(2)(g)); that T.N.H. had abandoned the child for a period of not less than ninety days (KRS 625.090(2)(a)); and that J.L.H. has been in foster care under the responsibility of the Cabinet for fifteen of the most recent twenty-two months preceding the filing of the petition to terminate parental rights (KRS 625.090(2)(j)).

On appeal, the Court of Appeals vacated the judgment terminating T.N.H.'s parental rights. The Court of Appeals adjudged that, while the Cabinet presented evidence that T.N.H. failed to provide essential care and protection for her son and was incapable of providing for his material and emotional needs (KRS 625.090(2)(e) and (g)), the Cabinet had failed to prove that T.N.H. was incapable of rendering such care in the future pursuant to the "no reasonable expectation of [significant] improvement" language in KRS 625.090(2)(e) and (g). The Court of Appeals opined that, in cases where the mother is a minor, the Cabinet should "present the family court with some testimony, preferably expert testimony, as to the likelihood that when the teen reaches adulthood, the parent cannot effectively parent the child." We subsequently granted the Cabinet's motion for discretionary review.

The grounds for involuntary termination of parental rights in KRS 625.090 relevant to the case at hand provide as follows:

(1) The Circuit Court may involuntarily terminate all parental rights of a parent of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that:

(a) 1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction;

2. The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding; or

3. The parent has been convicted of a criminal charge relating to the physical or sexual abuse or neglect of any child and that physical or sexual abuse, neglect, or emotional injury to the child named in the present termination action is likely to occur if the parental rights are not terminated; and

(b) Termination would be in the best interest of the child.

(2) No termination of parental rights shall be ordered unless the Circuit Court also finds by clear and convincing evidence the existence of one (1) or more of the following grounds:

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

. . .

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

. . .

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]

. . .

(j) That the child has been in foster care under the responsibility of the cabinet

for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights.

The definition of an "abused or neglected child" is set forth in KRS 600.020(1) and provides in pertinent part:

(1) "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when his parent, guardian, or other person exercising custodial control or supervision of the child:

. . .

(d) Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child;

. . .

(g) Abandons or exploits the child;

(h) Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being . . . . or

(i) Fails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months[.]

From Crawford's testimony at the termination hearing and the exhibits introduced by the Cabinet, we can easily say there was evidence presented that J.L.H. was an "abused or neglected child" within the meaning of KRS 600.020(1)(d), (g), (h), and (i). Even the Court of Appeals recognized "[i]t is not difficult to conclude that in the years prior to the termination hearing, mother did not provide essential care and protection for son and was incapable of providing for any of his material and emotional necessities."

T.N.H. claims there was no evidence that J.L.H. was abused or neglected within the meaning of KRS 600.020(1) because the child was committed to the Cabinet this whole time and all of his emotional, supervisory and material needs were met by the Cabinet through the maternal aunt or foster parents, who were the ones exercising custodial control and supervision over J.L.H. This argument is not well taken. Just because the child, and the parent for that matter, are committed to the Cabinet does not mean that the parent has no further responsibilities to the child. To the contrary, the Cabinet developed a case plan for T.N.H. that set forth specific duties and goals she was to meet regarding her relationship with and care of J.L.H. Additionally, the Cabinet continually offered services to T.N.H. that were intended to help her with these duties and goals. Yet, the evidence bore out that time and time again T.N.H. neglected her duties to J.L.H. and failed to complete the goals set out by the Cabinet.

For instance, during the time that T.N.H. was at HOI, which was to be an opportunity for T.N.H. to bond further and increase her parental role with J.L.H., T.N.H. was to care for the child when he was with her on school days and on weekends when she received extended overnight visitation with him at her aunt's home. The evidence established that T.N.H. would not adequately supervise or discipline J.L.H. or provide him with the necessary structure when he was in her care. Worse yet, she would simply go AWOL during this time, leaving the child to be cared for by her aunt or the foster parents. At one point, she was gone for 107 straight days, never calling to even check on J.L.H. and completely ignoring

her responsibilities to J.L.H. under the case plan.

T.N.H. also argues that her parental rights cannot be terminated for failing to provide for the child's financial and material needs because she and J.L.H. were both committed to the Cabinet and she was forbidden by her case plan from working and was required to go to school. We agree that T.N.H. could not have had her parental rights terminated for failing to provide for J.L.H.'s material needs (food, clothing, shelter, medical care) if that was the *sole* reason for termination. *See Dep't for Human Res. v. Moore,* 552 S.W.2d 672 (Ky.App.1977). Indeed, regardless of whether the parent is a minor or an adult, the language of KRS 625.090(2)(g) does not allow for termination on that basis alone unless the parent has failed to provide for the child's material needs "for reasons other than poverty alone[.]" In the present case, even if it was error for the trial court to find that T.N.H., for reasons other than poverty alone, failed to provide for J.L.H.'s material needs under KRS 625.090(2)(g), the Cabinet presented evidence of other grounds for termination under KRS 625.090(2)(a), (e), and (j). Under the language of KRS 625.090(2), the existence of only one of the grounds in that section needs to be proven by clear and convincing evidence.

■■ In reviewing a decision to terminate parental rights, the appellate court must determine if the family court's conclusion was based upon clear and convincing evidence and, in so doing, must apply the clearly erroneous standard of appellate review. CR 52.01; *J.M.R. v. Commonwealth, Cabinet for Health and Family Services,* 239 S.W.3d 116, 120 (Ky.App. 2007). "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *M.P.S. v. Cabinet for Human Res.,* 979 S.W.2d 114, 117 (Ky.App.1998) (citing *Rowland v. Holt,* 253 Ky. 718, 726, 70 S.W.2d 5, 9 (1934)). Pursuant to this standard, an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them. *K.R.L. v. P.A.C.,* 210 S.W.3d 183, 187 (Ky.App.2006).

■ We now turn to the Court of Appeals' basis for reversing the family court's judgment terminating T.N.H.'s parental rights—that the Cabinet failed to present specific evidence as to the likelihood that when T.N.H. reaches the age of majority, she would not be capable of effectively parenting J.L.H. The Court of Appeals reasoning was stated as follows:

> In cases such as this, where the parent's age and emotional immaturity undeniably contribute to her lack of parenting skills, we believe that termination must not be based solely on the parent's prior behavior without some objective assessment of her psychological and mental capacity to develop the required abilities to effectively parent a child.

Essentially, the Court of Appeals made the requirements for termination of a minor's parental rights under KRS 625.090(2)(e) and (g) more stringent by adding the requirement of proving that there is no expectation that the minor will be capable of rendering the necessary parental care when the teen reaches the age of majority. We reject this enhanced standard for termination of a minor's parental rights.

First and foremost, the language of KRS 625.090(2)(e) and (g) does not reflect an intent by the legislature to assess the "reasonable expectation of improvement" of a minor parent's conduct in terms of

when the parent reaches the age of majority, thereby potentially extending the amount of time the child would be committed to the Cabinet awaiting the parent's 18th birthday and magical transformation into a nurturing, caring parent. Rather, KRS 625.090(2)(g) specifically provides "that there is no reasonable expectation of significant improvement in the parent's conduct *in the immediately foreseeable future,* considering the age of the child[.]" (emphasis added).

As the Court of Appeals stated in *Cabinet for Families and Children v. G.C.W.,* 139 S.W.3d 172, 177 (Ky.App.2004):

> Congress overwhelmingly passed the AFSA to expedite the adoption of children in foster care and to address the phenomenon labeled as "foster care drift." See, 42 U.S.C. § 675(5)(c)(2000); Gordon, Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997, 83 Minn.L.Rev. 637, 650–651 (1999). In response to the AFSA, the Kentucky General Assembly made significant changes affecting the termination of parental rights: (1) the definition of an "abused and neglected" child was amended to include a child left to linger in foster care for 15 of the last 22 months (KRS 600.020(1)(i)); and (2) the grounds for termination enumerated in KRS 625.090(2) were enhanced to include a "15/22 month" provision (KRS 625.090(2)(j)).
>
> By enacting time limits to conform to the AFSA, it is clear that our legislature intended to leave children in foster care for as brief a time as possible.

Secondly, the basic needs of a child are the same, whether the child is of a minor parent or a parent of majority age. Why should a child of a minor parent be forced to linger in foster care longer than the child of an adult parent? A minor may be ill-equipped to parent simply by virtue of his or her immaturity. Nevertheless, age and immaturity cannot excuse a parent from his or her responsibility to meet the basic needs of the child. And, as aptly stated in the dissent in the Court of Appeals opinion below, "Adulthood is not a guarantee of parenting skills that meet even the minimum required under the law. The age of majority holds no magical formula to transform a mother who for years has refused to take her role as a mother seriously."

Several of our sister states have addressed this difficult issue of terminating a minor parent's rights and have concluded that the negative behavior and neglect by the minor parent must subordinate the minor's parental rights to the child's best interest. *See In re Adoption of Inez,* 428 Mass. 717, 704 N.E.2d 509 (1999); *Lecky v. Reed,* 20 Va.App. 306, 456 S.E.2d 538 (1995); *In re McCrary,* 75 Ohio App.3d 601, 600 N.E.2d 347 (1991); *Matter of A.H.,* 421 N.W.2d 71 (S.D.1988). In *Lecky,* wherein the facts were similar to the present case (fourteen-year-old mother who would periodically show some improvement and then run away from placement, leaving the child in foster care for two years), the Virginia Court of Appeals determined that the age of the mother did not alone constitute good cause to excuse her failure to resolve conditions which prompted her child's placement in foster care, and did not preclude a termination of her parental rights. 456 S.E.2d at 541.

> Nothing in this record attributes mother's parental deficiencies to her age or suggests that the mere passage of time would resolve her difficulties. Thus, further delay would prolong Jordan's familial instability without the promise of benefit to him, a result clearly contrary to the child's best interests. Under such circumstances, mother's age does

not alone constitute good cause to excuse her failure to resolve the conditions which prompted Jordan's foster care in accordance with statute.

. . .

The evidence was overwhelming that mother pursued an unstable and irresponsible lifestyle, incompatible with Jordan's needs and reflective of an indifference to his interests. This conduct spanned the child's entire life, despite the best efforts and substantial resources of DSS to assist and redirect mother in her behavior and parenting skills. Guided by Jordan's best interest, the record therefore provided the requisite "clear and convincing evidence" that termination of mother's residual parental rights in Jordan was the appropriate statutory remedy.

*Id.*

Likewise, from our review of the termination hearing in the instant case, the Cabinet presented clear and convincing evidence that T.N.H. abandoned J.L.H. for at least ninety (90) days, continuously failed to provide essential parental care and protection for J.L.H. for at least six (6) months, and that J.L.H. had been in foster care under the responsibility of the Cabinet for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights. Furthermore, the Cabinet presented sufficient evidence through the testimony of Crawford that there was no reasonable expectation of significant improvement in T.N.H.'s conduct in the immediately foreseeable future. As in *Lecky*, T.N.H. was repeatedly offered services and given chances by the Cabinet to demonstrate that she could be a parent to J.L.H. Unfortunately, she squandered these opportunities by running away to pursue her own interests and ignored the needs of her child, who should have been

her priority. Under the circumstances in this case, it was in the best interests of J.L.H. that the parental rights of T.N.H. be terminated so that J.L.H. could have the security and stability that every child deserves.

■ As to the other arguments raised by T.N.H. in her Appellee's brief as alternate grounds to support the Court of Appeals decision—that the Cabinet could not pursue termination against T.N.H. because she was committed to the Cabinet, that J.L.H. was not properly committed to the Cabinet, and that the petition for termination of parental rights was defective— T.N.H. should have raised these arguments via a cross motion for discretionary review. CR 76.21(1). No such cross motion was filed by T.N.H. herein. Thus, the issues are precluded from our review.

Accordingly, for the reasons stated above, we reverse the decision of the Court of Appeals and reinstate the family court's judgment terminating T.N.H.'s parental rights.

All sitting. All concur.